*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JEANINE D. SMITH,

        Plaintiff-Appellant,

TRANSITIONAL CONSULTING SERVICES, INC.
AND MICHIGAN RADIOLOGY INSTITUTE,
PLLC,

        Intervening Plaintiffs,

V

CITY OF DETROIT, MICHAEL SULLIVAN,
ELLIOTT BAUM, and NATALIE BAUM,

        Defendants-Appellees.

UNPUBLISHED
September 2, 2021

No. 353606
Wayne Circuit Court
LC No. 18-006073-NF

Before: RIORDAN, P.J., and MARKEY and SWARTZLE, JJ.

PER CURIAM.

Plaintiff Jeanine D. Smith appeals by right the trial court's order granting summary disposition in favor of defendants city of Detroit, Michael Sullivan, and Elliott and Natalie Baum under MCR 2.116(C)(10). Smith was allegedly injured as a result of an accident involving a city bus in which she was a passenger. Smith asserted first-party and third-party claims. The trial court determined as a matter of law that Smith did not suffer an injury as a result of the accident. We reverse and remand for further proceedings.

## I. THE ACCIDENT

On May 5, 2017, at approximately 1:25 p.m., a city bus carrying Smith as a passenger stopped at a light at the intersection of Woodward Ave. and Eight Mile Rd. The bus had been traveling north on Woodward when it pulled into a left-hand turn lane at the stoplight. The bus driver, defendant Michael Sullivan, intended to turn left and proceed west on Eight Mile. There were two left-hand turn lanes on Woodward at the light, and the bus was in the right-side, left-hand turn lane. An SUV driven by defendant Natalie Baum stopped at the same intersection,

pulling into the left-side, left-hand turn lane next to the bus; she had no passengers. Defendant Elliott Baum owned the SUV. When the Woodward light to turn left changed to green, the bus began turning left, staying in the appropriate lane. The vehicle Natalie Baum was operating, however, went straight ahead, entered into the bus's lane, and was struck by the bus. Natalie Baum was ticketed for the incident. A city service inspector prepared the following diagram of the accident:



The service inspector accident report indicated that "[t]he collision caused damage to the left front mirror of the [bus], while the auto had a right rear side dent to the quarter panel." The report asserted that there were no injuries to the ten passengers on the bus or to driver Sullivan. The Ferndale Police responded to the scene, but there was no EMS response. Ms. Baum was able to drive away in her car after the police were finished processing the scene. Sullivan pulled the bus into a garage, where the passengers, including Smith, disembarked and then caught another city bus.

In a written statemen to the police, Smith indicated that when the accident occurred, her "body shifted," causing her "to instantly feel back pain." Smith stated that she remembered "constantly looking back into the seat trying to understand what happened or what hit [her] back

causing the pain." She suggested in her statement that she may have struck "a divider in the seats[.]" Smith claimed that when the accident occurred bus driver Sullivan blurted out, " '[S]he turned in my lane.' " Smith contended that neither the police nor Sullivan asked if she or the other passengers were okay and that medical attention was never offered.

## II. THE LITIGATION

In her amended complaint, Smith alleged that she "sustained aggravation of a preexisting condition of [her] lower back, including L4-L5-S1 disc desiccation, a lumbar procedure causing permanent scarring and disfiguration and [cervical] injection procedures . . . due to her involvement in [the] . . . accident[.]" She further alleged that the accident caused "her body to be jerked" and that her body "received a traumatic force and twisted in an unusual fashion."

In Count I of the complaint, Smith sought the recovery of personal protection insurance (PIP) benefits from defendant city under the no-fault act, MCL 500.3101 *et seq.* Smith claimed that the city had refused to pay her any PIP benefits. In Count II of the complaint, Smith requested declaratory relief, asking for a determination that the city owed Smith PIP benefits, plus interest, attorney fees, and costs. In Count III, Smith alleged that Sullivan drove the bus in a negligent manner that resulted in the accident and her injuries. Although not entirely clear from the complaint, it appears that Smith also asserted a third-party claim for damages against the city in Count III under the motor-vehicle exception to governmental immunity, MCL 691.1405. In Count IV of the complaint, Smith, citing 42 USC 1395y(b)(3)(A), sought double damages against the city because Medicare ended up paying her medical bills when the city had the highest priority of responsibility for those bills but refused to pay. In Count V, Smith maintained that Natalie Baum operated her vehicle in a negligent manner and caused the accident and Smith's injuries. And, finally, in Count VI, Smith alleged that defendant Elliott Baum was liable under the owner-liability statute, MCL 257.401.[1]

Defendants city and Sullivan moved for summary disposition under MCR 2.116(C)(7) and (10). They argued that there was no evidence that Sullivan was at fault for the accident; therefore, Smith was not entitled to tort damages from Sullivan or the city. They additionally contended that they were immune from liability because Sullivan's conduct did not amount to gross negligence as a matter of law and because the motor-vehicle exception to governmental immunity did not apply to make the city liable given the lack of any negligence by Sullivan. Defendant city also maintained that the claim for first-party, no-fault PIP benefits failed as a matter of law because Smith did not suffer any bodily injuries as a result of the accident. The city noted that the accident was very minor, that Smith did not report any injuries or seek medical treatment after the accident, and that Smith's primary physician sent her for an MRI (magnetic resonance imaging) about one

---

[1] Transitional Consulting Services, Inc., and Michigan Radiology Institute, PLLC, which entities had provided services and treatment to Smith, filed claims as intervening plaintiffs, but stipulated orders were eventually entered dismissing the intervening claims. Smith's claim of appeal was initially dismissed for lack of a final order because the intervening plaintiffs' actions were still afloat at the time. See *Smith v Detroit*, unpublished order of the Court of Appeals, entered March 17, 2020 (Docket No. 352739).

month after the accident, resulting in findings of an "unremarkable examination of the lumbar spine and sacrum."

In response, Smith conceded that it was Natalie Baum's negligence alone that caused the motor vehicle accident; therefore, Smith abandoned her claim against Sullivan for bodily injuries. Accordingly, Smith also dropped her claim for third-party benefits against the city because if Sullivan was not negligent, there could be no liability for the city under the motor-vehicle exception to governmental immunity. Smith, however, still sought to hold the city liable for no-fault PIP benefits. Smith argued that she presented evidence sufficient to create a genuine issue of material fact regarding whether she sustained an injury in the accident. In support, Smith pointed to her deposition testimony, her statement to police, emergency room records, spinal recovery records, the records of Dr. Anthony Spearman, the records and affidavit of Dr. Marvin Bleiberg, and the opinion of Dr. Steven Arbit, who conducted an independent medical examination (IME) on behalf of the defense. Smith argued that "[t]he medical records show that all personnel who treated and examined [her] . . . found that she was so severely injured that she was prescribed [medications], case management, attendant care, and transportation."

Defendants Natalie and Elliott Baum filed their own motion for summary disposition under MCR 2.116(C)(10), arguing that Smith could not establish that she sustained "any objective injury" as a result of the accident. Smith, therefore, was unable to create a genuine issue of material fact regarding whether she suffered a serious impairment of body function. In response, Smith again cited a litany of medical evidence and records, referred to in the preceding paragraph, that purportedly established a genuine issue of material fact concerning whether she suffered an objective injury or serious impairment of body function. We shall discuss the nature of the medical documentary evidence in the analysis section of this opinion.

On January 29, 2020, the trial court conducted a hearing on the two motions for summary disposition. The trial court entertained the parties' arguments and granted the two motions for summary disposition. The full extent of the court's reasoning was that there was no injury based on the MRI taken one month after the accident.[2] The trial court did not address or acknowledge the medical records and evidence submitted by Smith. It was a brief ruling.

## III. ANALYSIS

### A. SMITH'S APPELLATE ARGUMENTS

With respect to Smith's claim against the city for no-fault PIP benefits, she argues that the trial court erred by summarily dismissing the claim because she presented evidence sufficient to create a genuine issue of material fact regarding whether she suffered an accidental bodily injury arising out of the operation or use of a motor vehicle. With regard to Smith's claim against the Baums for tort damages, she contends that the trial court erred by summarily dismissing the claim because she presented evidence sufficient to create a genuine issue of material fact regarding

---

[2] Specifically, the trial court ruled, "Based on the MRI 1 month after there's no injury, the Court will grant both motions."

whether she sustained an objectively manifested impairment of an important body function that affected her general ability to lead her normal life.

## B. STANDARD OF REVIEW AND PRINCIPLES GOVERNING MCR 2.116(C)(10)

"This Court reviews de novo a trial court's decision on a motion for summary disposition." *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). We also review de novo issues of statutory interpretation. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). "A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact." *Id.* "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). *Pioneer State*, 301 Mich App at 377. A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). "Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes *all legitimate inferences* in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994) (emphasis added).

## C. NO-FAULT CLAIM – ACCIDENTAL BODILY INJURY ARISING OUT OF OPERATION AND USE OF A MOTOR VEHICLE

"Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle[.]" MCL 500.3105(1). Not any bodily injury triggers an insurer's liability under the no-fault act; rather, it is only those injuries that are actually caused by the use or operation of a motor vehicle that creates liability. *Douglas v Allstate Ins Co*, 492 Mich 241, 257; 821 NW2d 472 (2012). The Legislature "chose to provide coverage only where the causal connection between the injury and the use of a motor vehicle as a motor vehicle is more than incidental, fortuitous, or 'but for.' " *Thornton v Allstate Ins Co*, 425 Mich 643, 659; 391 NW2d 320 (1986). PIP benefits are payable for "[a]llowable expenses consisting of reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." MCL 500.3107(1)(a).

## D. SERIOUS IMPAIRMENT OF BODY FUNCTION – MCL 500.3135

Aside from certain enumerated exceptions, the no-fault act abolished tort liability for injuries caused by the ownership, maintenance, or use of a motor vehicle. *Gray v Chrostowski*,

298 Mich App 769, 775; 828 NW2d 435 (2012). MCL 500.3135(1) provides a threshold exception to tort immunity with respect to the recovery of noneconomic damages. *Id.* MCL 500.3135(1) states that "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle [but] only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." At the time of the accident, MCL 500.3135(5) defined a "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." 2012 PA 158.[3]

Under the first prong of the prior version of MCL 500.3135(5), it had to be proven that the injured party suffered an objectively manifested impairment of body function. See *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010).[4] With respect to that issue, we note that the focus is on whether the alleged *impairment* was objectively manifested, not whether the *injury* was objectively manifested. *Id.* at 197; *Patrick v Turkelson*, 322 Mich App 595, 606; 913 NW2d 369 (2018). We think it helpful to give an example of the distinction. If a person is in a motor vehicle accident, suffers a broken leg as a result, and then is unable to walk for a couple of months because of the broken leg, the "injury" would be the fractured or broken leg and the "impairment" would be the inability to walk. See *McCormick*, 487 Mich at 197 ("while an injury is the actual damage or wound, an impairment generally relates to the effect of that damage").

After reviewing various dictionary definitions, our Supreme Court in *McCormick* concluded "that the common meaning of [an] 'objectively manifested' [impairment] . . . is an

---

[3] Pursuant to an amendment of MCL 500.3135, enacted under 2019 PA 21 and 22, and made effective June 11, 2019, subsection (5) of the statute now provides:

> As used in this section, "serious impairment of body function" means an impairment that satisfies all of the following requirements:
>
> (a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.
>
> (b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.
>
> (c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident.

[4] We note that the *McCormick* Court referred to subsection (7) of MCL 500.3135, which, at that time, contained the "objectively manifested impairment" language. See 2002 PA 697.

impairment that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *McCormick*, 487 Mich at 196. Stated otherwise, "an 'objectively manifested' impairment is commonly understood as one observable or perceivable from actual symptoms or conditions." *Id.* A plaintiff must submit evidence showing that there is a physical basis for a subjective complaint of pain, which generally requires medical testimony. *Id.* at 198; see also *Patrick*, 322 Mich App at 607 ("Although mere subjective complaints of pain and suffering are insufficient to show impairment, evidence of a physical basis for that pain and suffering may be introduced to show that the impairment is objectively manifested.").

## E. DISCUSSION OF DOCUMENTARY EVIDENCE

With respect to the trial court's ruling that there was no injury, we assume that the court meant that Smith had no injury that was caused by the accident, and we shall proceed on that basis. We initially note that Smith was injured while riding on a bus in 2013, as reflected in the following passage from a medical record:

> She had another accident while sitting on [a] bus in 2013; she was again facing forward. The bus driver suddenly hit the brakes and she was ejected out of her seat. She was taken by ambulance to St. John Hospital on Hoover Road. She was diagnosed with whiplash, a low back injury, and a shoulder problem.[5]

In her July 2018 deposition, Smith testified that after the accident on May 5, 2017, she began "to walk in a leaning over position" due to her back pain. According to Smith, a couple of days after the accident she could no longer "stand independently" and could not "sit at all" because of the back pain, which radiated through her legs. She claimed that she fell numerous times, even though she did not seek medical attention for the falls. Smith testified that she needed a caregiver because her range of motion was very limited and she "couldn't do anything for [her]self." She was currently attending physical therapy three times a week.[6] Smith, who was 44 years old at the time of the accident and had been a caregiver when she was younger, testified that she became "extremely depressed" and "extremely suicidal" because of the pain.[7]

Three days after the accident at issue in this case, Smith went to the emergency room (ER) at St. John Macomb Hospital complaining of back pain. X-rays were taken, but "no acute

---

[5] Smith testified in her deposition that she hurt her shoulders, neck, and back in the accident. She indicated that she went to the hospital three or four times for her injuries. Smith testified that she conferred with an attorney regarding the accident, but the lawyer informed her that the city was in bankruptcy, so Smith did not pursue any litigation. We also note that Smith was the victim of an assault in 2014 that resulted in a head injury.

[6] There was evidence that Smith did not engage in physical therapy for a few months after the accident because of insurance issues.

[7] We note that there was evidence that Smith's history revealed issues concerning her mental health, housing, deceitfulness, and use of alcohol. For purposes of resolving this appeal, we find it unnecessary to explore those matters in detail.

traumatic abnormalities [were] identified." The ER physician prescribed Flexeril and Motrin for Smith. According to the ER report, Smith's final impression was "[l]umbosacral strain."

An MRI was performed on June 6, 2017. This is the MRI and the only documentary evidence mentioned by the trial court. The MRI was of Smith's lumbar spine and sacrum and was performed without contrast. The radiologist interpreting the MRI made the following findings:

Normal vertebral body height, alignment, and marrow signal are preserved. The conus is normal in signal and terminates al L1.

T12-L1 through L3-L4 unremarkable.

At L4-L5, mild disc bulge eccentric to the left. The canal and foramina are patent.

Normal marrow signal is preserved in the sacrum. The sacroiliac joints are patent and unremarkable.

The radiologist's impression of the MRI was as follows: "Essentially unremarkable examination of the lumbar spine and sacrum."

Defendants presented a report by a neuroradiologist, Dr. Michael Zydeck, who conducted an independent radiology review of the June 6, 2017 MRI. Dr. Zydeck opined that there was "[n]o disc herniation, central canal or neural foraminal narrowing," as to L1-L2, L2-L3, L3-L4, and L4-L5. With respect to L5-S1, he found "mild degenerative posterior disc bulge without central canal or foraminal narrowing." He noted that there were "facet joint arthritic changes." Dr. Zydeck concluded that "[t]here is no evidence of acute post traumatic injury in the lumbar spine."

Dr. Spearman, Smith's primary care physician, saw Smith on June 30, 2017, and he noted that Smith had lower back pain, muscle spasms in her back, generalized muscle weakness, unsteadiness, and other abnormalities in her gait.[8] On August 27, 2017, Dr. Arbit performed an IME. In his report, Dr. Arbit opined that none of Smith's current complaints were related to the accident and that she did not need any ongoing treatment for accident-related injuries. In an addendum to the IME report, Dr. Arbit indicated, "It is my opinion [that Smith] most likely had a sprain/strain as a result of the accident in question."

On August 31, 2017, Smith underwent a lumbar computed tomography (CT) scan. According to the accompanying CT report, the radiologist found that "[t]he vertebral body heights

---

[8] We note that this information comes from a summation of Smith's history contained in an IME report from February 2019. The IME was performed by Dr. Mary K. Kneiser. She concluded in the IME report as follows:

Based on information to date, I am not able to identify objective evidence of residual of an accident-related injury that would explain her current physical exam nor explain the need for further testing, treatment, household assistance or work restrictions that would be indicated for any accident-related injury.

and intervertebral disc spaces appear[ed] preserved," that "[t]here [was] no evidence for acute fracture or malalignment," and that "[t]here [was] no significant neural foraminal narrowing." A bone scan that was also performed on August 31, 2017, produced the following impression:

> Mild asymmetrical radiotracer uptake in the inferior right SI joint, could be related to posttraumatic etiology. No other definite focus seen in the spine and pelvis to explain patient's pain.

Pelvis and hip x-rays were also taken on August 31, 2017, and the radiologist found that the appearance of the left and right hip was "[u]nremarkable," along with finding:

> The bone mineralization appears within normal limits. There is no acute fracture or dislocation. The joint spaces are relatively well-maintained. The soft tissues are grossly unremarkable. There is sclerosis of the right and left pubic bone.

On September 15, 2017, medical personnel conducted an electromyography (EMG) to study Smith's nerve and muscle functions. The EMG revealed "[n]o electrodiagnostic evidence for a Lumbar Radiculopathy" and "[n]o electrodiagnostic evidence for a Lower Limb Neuropathy."

On November 8, 2017, medical personnel performed an MRI of Smith's cervical spine,[9] absent contrast and with flexion-extension and alar (ligament) protocol employed, resulting in the following impression:

> 1. C4-5; Broad based posterocentral disc herniation / protrusion compressing the thecal sac.
>
> 2. C5-6; Diffuse disc bulge compressing the thecal sac. Mild facet joint arthropathy is seen.
>
> 3. C6-7; Diffuse disc bulge compressing the thecal sac. Mild facet joint arthropathy is seen.
>
> 4. No listhesis on flexion and extension views.
>
> 5. Thin section through the C1 and C2 as per the ALAR protocol demonstrates sprain to the right transverse and alar ligament with subtle increase in the right paraodontoid space.

A report by neuroradiologist Dr. Zydeck, conducting another independent review, was submitted to the court with respect to the November 8, 2017 MRI of Smith's cervical spine. He concluded:

---

[9] We note, as indicated earlier, that the first MRI was of the lumbar spine.

1.        There is no evidence of acute post traumatic injury in the cervical spine.

2.        There are mild degenerative disc bulges at C4-C5, C5-C6.

3.        There is no evidence of sprain or injury to the right transverse or alar ligaments.

Dr. Zydeck otherwise noted that there was "[n]o disc herniation, central canal or neural foraminal narrowing." Unlike the impressions concerning the June 6, 2017 MRI of the lumbar spine, as to which the interpreting radiologist and Dr. Zydeck generally agreed, there were differences of opinion with respect to the November 8, 2017 MRI of Smith's cervical spine, as reflected above.

On the same date, November 8, 2017, an MRI of Smith's lumbar spine was also performed, with and without weight-bearing and without contrast. The radiologist's impression of the MRI was as follows:

1.        Scoliosis of the lumbar spine with convexity towards right side.

2.        L4-5; Diffuse disc bulge compressing the thecal sac and causing some narrowing of the bilateral neural foramina. Bilateral facet joint arthropathy is seen.

3.        L5-S1; Diffuse disc bulge compressing the thecal sac and causing some narrowing of the bilateral neural foramina.

* * *

5.        Weight bearing scans confirm above findings with respect to disc changes.

Dr. Zydeck also reviewed the November 8, 2017 MRI of Smith's lumbar spine. His report was essentially identical to his report concerning the June 6, 2017 lumbar-spine MRI.[10]

---

[10] In March 2015, before the accident occurred and following her 2013 accident and 2014 assault, Smith underwent an MRI of her cervical spine. The MRI report indicated that Smith had complained of "headache and neck pain since December of 2014." The radiologist's impression provided:

    1.        There is slight straightening of the normal lordotic curvature throughout the cervical spine with very mild degenerative changes present. There is no evidence of an acute fracture.

    2.        Diffuse posterior disc bulging is seen at the C4-5 and C5-6 disc levels. A small disc herniation is probably present in the midline at the C4-5 level. This does not produce spinal stenosis. There is no other evidence of disc herniation or spinal stenosis.

On January 10, 2018, medical personnel performed an MRI of Smith's thoracic spine without contrast. The radiologist's impression was as follows: "T6-7, T7-8, T8-9; Posterocentral disc herniation / protrusions compressing the thecal sac." Neuroradiologist Dr. Zydeck once again performed an independent review, finding that the MRI of the thoracic spine was negative and concluding that there was "no evidence of acute post traumatic injury in the thoracic spine."

The Baums submitted a letter from a different neuroradiologist, Dr. Adeel Khalid, who asserted that he had reviewed all of the MRIs. Dr. Khalid disagreed with the findings and impressions of the radiologist who had reviewed the November 2017 and January 2018 lumbar, cervical, and thoracic spine MRIs. Dr. Khalid opined that the findings and impressions were exaggerated and that the MRIs actually revealed normal degenerative changes that could not be associated with the accident.

There was documentary evidence that Smith received Toradol injections for her pain and that in February 2018, a surgeon implanted a "dorsal column spinal cord stimulator paddle" and a "generator battery through a separate incision." There was evidence that the spinal stimulator provided some relief to Smith.

The Baums submitted a report by a biomechanical engineer who reviewed all of the information regarding the accident and Smith's medical records. The engineer concluded:

> In sum, based on the analyses presented above, the subject incident of May 5, 2017, would not generate the type and magnitude of loading associated with causing the documented pathologies of Ms. Smith's spine. The loads experienced by Ms. Smith in the subject incident did not provide the type or magnitude of loading consistent with the mechanics for spinal injury beyond possible transient spinal strain and would have been significantly less than those experienced when performing simple daily activities.

On appeal, Smith relies primarily on the affidavit of Dr. Bleiberg, who operates a practice known as Michigan Spine and Pain. Dr. Bleiberg averred that he is a specialist in the fields of physical medicine, rehabilitation, and pain and that he had "many years of experience treating motor vehicle accident victims." According to Dr. Bleiberg, he first treated Smith in August 2017 and last saw her in April 2018. Dr. Bleiberg stated that he found, on physical examination of Smith, involuntary muscle spasms in the paravertebral muscles and posterior thoracic and lumbar muscles. He opined that those spasms were objective manifestations of injuries that arose from the accident. Dr. Bleiberg also noted loss of Smith's normal lordotic curve with rotoscoliosis and a list to the right. He attributed these injuries to the accident and characterized them as objective manifestations. Dr. Bleiberg averred that he obtained and reviewed the November 8, 2017 lumbar-spine and cervical-spine MRIs and the January 10, 2018 thoracic-spine MRI. He opined that these MRIs reflected or demonstrated objective manifestations of injuries arising out of the accident and

---

3.      The neural foramen are patent bilaterally.

4.      No focal signal changes are seen in the cervical cord, although a small amount of motion artifact is present.

were totally consistent with his diagnoses and Smith's subjective complaints of pain. Dr. Bleiberg further averred:

I have treated Ms. Smith with what are in my opinion, reasonable and necessary modalities of treatment which include physical therapy, epidural steroid injections, implantation of a spin[a]l cord stimulator, and medication. It is my opinion that these treatments were occasioned by the bus accident of 5-5-17.[11]

Dr. Bleiberg opined that Smith "is and has been totally disabled since the bus accident" and that her "important body functions have been impaired by [the] bus accident." For those reasons, Dr. Bleiberg prescribed attendant care, household services, transportation, and case management for Smith. He concluded that Smith "suffered multiple objectively manifested, medically identifiable injuries as a direct result of the 5-5-17 bus accident[.]"

## F. OUR RULING

We first note that we are troubled by the trial court's apparent failure to consider any evidence except the June 6, 2017 MRI. That is not how motions for summary disposition under MCR 2.116(C)(10) are examined and resolved. See MCR 2.116(G)(5) ("The affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties, *must be considered by the court* when the motion is based on subrule [C] . . . [10].") (emphasis added).

With respect to the claim against the city seeking no-fault PIP benefits, there was more than sufficient evidence to create a genuine issue of material fact regarding whether Smith suffered an injury arising out of or caused by the accident involving the bus. Neither the no-fault act nor the caselaw construing the no-fault act requires that the evidence of injury be objectively or medically identifiable or that the injury be objectively manifested. Smith's deposition testimony, in and of itself, supplied evidence that she sustained injuries as a result of the accident. And assessments regarding her credibility and the weight of her testimony are matters for a jury, not this Court or the trial court. *Pioneer State*, 301 Mich App at 377. Additionally, the ER report indicated that Smith suffered a "lumbosacral strain," and in her statement to the police, Smith claimed that she felt pain when the accident occurred. In Dr. Arbit's IME report, he observed that it was his opinion that Smith "most likely had a sprain/strain as a result of the accident in question." Undoubtedly, a short-lived, nonserious injury can arise out of or be caused by a motor-vehicle accident. Whether the extent of Smith's injuries justifies her alleged needs and prescribed services and care is a separate question. Furthermore, Dr. Bleiberg's affidavit clearly provided evidence that Smith suffered an injury arising out of the accident. His credibility is also for the jury to assess. *Id.*

The city's cursory 1½ - page argument on appeal does not sway us. The city argues that Smith's "medical history shows that she had the same medical conditions before the accident that she complains of now." This argument fails to appreciate that when a person has suffered multiple back injuries they are not all the same simply because the back is generally involved in each injury.

---

[11] We note that the affidavit is full of spelling errors.

-12-

When the report of the 2015 MRI of the cervical spine is compared to the report of the November 8, 2017 MRI of the cervical spine, the latter references a diffuse disc bulge at C6-7 not mentioned in the former and the latter also refers to disc bulges at the C4-5 and C5-6 levels that, while mentioned in both MRI reports, are compressing the thecal sac, which compression is not identified in the 2015 MRI report. The November 8, 2017 MRI report of the cervical spine also indicated that there was a "sprain to the right transverse and alar ligament," which was not noted in the 2015 MRI. When these MRIs are considered in conjunction with Dr. Bleiberg's affidavit, there is evidence contradicting the city's contention that "the same medical conditions" are at issue.[12] The city itself does not pose an argument challenging Dr. Bleiberg's affidavit but instead references and adopts the Baums' appellate argument regarding Dr. Bleiberg, which we reject for the reasons stated below. In sum, we hold that the trial court erred by summarily dismissing Smith's claim against the city for PIP benefits.

With respect to the Baums, Smith was required to present documentary evidence showing an objectively manifested impairment of an important body function. In other words, Smith needed to submit evidence of actual symptoms or conditions that someone other than Smith could observe or perceive as impairing a body function. *McCormick*, 487 Mich at 196. When viewed in a light most favorable to Smith, we conclude that she presented sufficient documentary evidence to survive the Baums' motion for summary disposition.

The Baums devote a great deal of attention to the law of "causation." They then conduct a review of the various forms of diagnostic testing undergone by Smith, which we have summarized in this opinion. The Baums acknowledge the November 2017 and January 2018 MRIs and Dr. Bleiberg's affidavit that relies, in part, on those MRIs in forming his opinions. They then present the following argument:

> In this case, Dr. Bleiberg's opinions contained in his affidavit are not based on personal knowledge and are not based on sufficient facts or data to create an issue of fact on causation. His opinion was based solely on [Smith's] subjective complaints to him and his review of [the] November 2017 and January 2018 MRIs. . . . [T]he affidavit failed to provide[] sufficient admissible evidence on causation and, therefore failed to create a genuine issue of material fact on whether the claimed injuries were caused by the accident.

Accordingly, it is the Baums' position that Dr. Bleiberg's averments in his affidavit on the issue of causation did not constitute substantively admissible evidence, as necessary to be considered for purposes of summary disposition. See MCR 2.116(G)(6) ("Affidavits . . . offered in . . . opposition to a motion based on subrule [C] . . . [10] shall only be considered to the extent that the content or substance would be admissible as evidence to establish or deny the grounds stated in the motion."). We reject this argument and conclude that the substance of Dr. Bleiberg's averments on causation constitutes admissible evidence and that the Baums' arguments actually

---

[12] We also note that "the aggravation or triggering of a preexisting condition can constitute a compensable injury." *Fisher v Blankenship*, 286 Mich App 54, 63; 777 NW2d 469 (2009).

pertain to the weight of the evidence contained in the averments, which, like credibility, is a matter for the jury. *Pioneer State*, 301 Mich App at 377.

The crux of the Baums' argument is that Dr. Bleiberg's averments on causation were too speculative to be considered. In general, establishing causation in a negligence case entails proving "two separate elements: (1) cause in fact, and (2) legal cause, also known as 'proximate cause.' " *Skinner*, 445 Mich at 162-163. In *Skinner*, our Supreme Court explained:

> The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. A plaintiff must adequately establish cause in fact in order for legal cause or "proximate cause" to become a relevant issue. [*Id*. at 163 (citations omitted).]

Circumstantial evidence and reasonable inferences arising from the evidence can be utilized to establish causation. *Id*. at 163-164. But it is not sufficient to proffer "a causation theory that, while factually supported, is, at best, just as possible as another theory." *Id*. at 164. A "plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Id*. at 164-165. "[L]itigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess." *Id*. at 174. The *Skinner* Court further observed that the evidence does not have to negate all other possible causes, and that absolute certainty with respect to causation is not required. *Id*. at 166. A court must dismiss an action when causation remains an issue of pure speculation and conjecture, or the probabilities are evenly balanced at best. *Genna v Jackson*, 286 Mich App 413, 418; 781 NW2d 124 (2009).

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) *the testimony is based on sufficient facts or data*, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [Emphasis added.]

In this case, Dr. Bleiberg's affidavit reflects that he physically examined Smith in office visits from August 2017 to April 2018, which revealed involuntary muscle spasms in the paravertebral muscles and posterior thoracic and lumbar muscles, along with a loss of Smith's normal lordotic curve with rotoscoliosis.[13] Dr. Bleiberg also relied on the November 2017 and

---

[13] This Court has stated that "we are persuaded that the finding of muscle spasms is an objective manifestation of injury." *Franz v Woods*, 145 Mich App 169, 176; 377 NW2d 373 (1985),

January 2018 MRIs. We note that the June 2017 MRI was only of the lumbar spine, while the later MRIs were of the lumbar, cervical, and thoracic spine. We further point out that the interpretations or impressions of the November 2017 MRIs and the January 2018 MRI varied as between the radiologist who reviewed the MRIs in the normal course and the two neuroradiologists upon whom defendants relied. The neuroradiologists painted a rosy picture that eliminated the accident as causing any abnormalities, while the radiologist found multiple "disc bulge[s] compressing the thecal sac," and a "sprain to the right transverse and alar ligament," which were not noted by the neuroradiologists. Additionally, the August 2017 bone scan spoke of the possibility of a "posttraumatic etiology."

The "impairments" in this case are pain and lack of mobility, and the substance of Dr. Bleiberg's affidavit constituted evidence that the impairments were objectively manifested, as revealed by physical examination of Smith and review of the MRIs, and that the accident was the cause of the impairments. Dr. Bleiberg's opinions were based on sufficient facts and data and personal knowledge.

The Baums complain that there is no indication that Dr. Bleiberg was familiar with or reviewed all of the various medical tests performed on Smith and other records regarding her care and treatment, all of which are referred to in this opinion. These asserted shortcomings in Dr. Bleiberg's opinions go to the weight of the evidence and not its admissibility. See *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 401; 628 NW2d 86 (2001) (noting that "an opposing party's disagreement with an expert's opinion or interpretation of facts . . . are matters of the weight to be accorded to the testimony, not its admissibility"). The alleged shortcomings also pertain to Dr. Bleiberg's credibility, which we cannot consider for purposes of summary disposition. *Pioneer State*, 301 Mich App at 377.

The Baums contend that there was no evidence that "Dr. Bleiberg had any of the records, including the lumbar, cervical and thoracic spine MRI findings[.]" Dr. Bleiberg averred that he obtained and personally reviewed the MRIs of the lumbar, cervical, and thoracic spine performed in November 2017 and January 2018. Viewing the evidence in a light most favorable to Smith, we must accept his averments as true for purposes of the (C)(10) motion. *Pioneer State*, 301 Mich App at 377. The Baums appear to also maintain that Dr. Bleiberg's affidavit is problematic because he did not first see Smith until about four months after the accident. Again, this argument goes to the weight of the evidence and credibility. *Id.*

Finally, the Baums call into question Dr. Bleiberg's affidavit because his interpretation of the MRIs is inconsistent with the interpretation of the two neuroradiologists, Dr. Zydeck and Dr. Khalid, whose expertise at reading MRIs far surpasses Dr. Bleiberg's abilities. Once again, this is a matter of weight and credibility, which cannot be entertained in the context of summary

---

overruled in part on other grounds by *DiFranco v Pickard*, 427 Mich 32; 398 NW2d 896 (1986), superseded by statute in an amendment of MCL 500.3135. We note that Dr. Spearman also noted that Smith was experiencing muscle spasms during a June 30, 2017 office visit.

disposition. *Id.* In sum, viewing the evidence in a light most favorable to Smith, we hold that the trial court erred in granting summary disposition in favor of the Baums.

We reverse and remand for proceedings consistent with this opinion. We do not retain jurisdiction. Having fully prevailed on appeal, Smith may tax costs under MCR 7.219.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Brock A. Swartzle